E-filing

HOPE RENEWED
Mark A. Manning
1152 98th Ave
Oakland, CA. 94603

FILED

MAR 1 8 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF COURT
DISTRICT OF CALIFORNIA
OAKLAND

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ADR (2)

| | |
|---|---|
| HOPE RENEWED | Case No.: **C11-01324** JF |
| Mark A. Manning, Pro se | FRAUDULENT ADVERSE POSSESSION PETITION FOR DEMAND FOR JUSTICE A VOID OF JUDGEMENT FOR COLLATERAL DAMAGE |
| Plaintiff, | FOR: |
| vs. | |
| BAC HOME LOANS SERVICING, LP | 1. DEFENDANTS' FRAUD; AND 2. DEFENDANTS' USE OF VOID CONTRACT PURSUANT TO AMERICAN JURISPRUDENCE SECOND EDITION 46 § 203 |
| and JOHN DOES | |
| (Investors) 1-10,000 | |
| | PLAINTIFF STATES THE CLAIM FOR WHICH RELIEF CAN BE GRANTED PURSUANT TO: F.R.Cv.P. RULE 12(b)(6) |
| Defendant | |
| | EXHIBITS 1 - 6 |

**COMES NOW**, HOPE RENEWED and Mark A. Manning, Plaintiffs, for Petition for Forcible Detainer, Notice and Demand for Justice, and Void of Judgment for consequential Collateral Damage. Plaintiffs are informed and believe that this property reeked with fraudulent filings and a fraudulent and deceptive sale that failed to follow the requirements of California Government Code § 27287 and Calif. Civil Code § § 2924 and 2932.5. The sale was wholly defective and transferred no rights to anyone making it thus void... ..... "causing" - automatic "Voided Judgment" with assuming personal and collateral damages in case No. 511CV005878 for DENIAL of DUE PROCESS.

A void judgment is one which, from its inception, is and forever continues to be absolutely null, without legal efficacy, ineffectual to bind the parties or to support a right, of no legal force and effect whatever, and incapable of enforcement in any manner or to any degree — *Loyd v. Director, Dept. of Public Safety,* 480 So. 2d 577 (Ala. Civ. App. 1985).

A judgment shown by evidence to be invalid for want of jurisdiction is a void judgment or at all events has all attributes of a void judgment, *City of Los Angeles v. Morgan,* 234 P.2d 319 (Cal.App. 2 Dist. 1951).

Void judgment which is subject to collateral attack, is simulated judgment devoid of any potency because of jurisdictional defects, *Ward v. Terriere,* 386 P.2d 352 (Colo. 1963).

A void judgment is a simulated judgment devoid of any potency because of jurisdictional defects only, in the court rendering it and defect of jurisdiction may relate to a party or parties, the subject matter, the cause of action, the question to be determined, or relief to be granted, *Davidson Chevrolet, Inc. v. City and County of Denver,* 330 P.2d 1116, certiorari denied 79 S.Ct. 609, 359 U.S. 926, 3 L.Ed. 2d 629 (Colo. 1958}.

Void judgment is one entered by court without jurisdiction of parties or subject matter or that lacks inherent power to make or enter particular order involved and such a judgment may be attacked at any time, either directly or collaterally, *People v. Wade,* 506 N.W. 2d 954 (Ill. 1987).

Under laws adopted by all 50 states, the owner of a "negotiable instrument" such as a promissory note must be in physical possession of the document. The basic standard approved by the 50 state pact was denied to Plaintiffs' thereby allowing them NO DUE PROCESS. The basic standard for all affidavits filed in residential mortgage foreclosure cases must indicate that the affiant has actual personal knowledge of the file and loan history in question and has personally reviewed the

documents, records, or other data relied upon to make the statements contained in the affidavit. Failure to provide appropriate affidavits may result in mandatory personal attendance of an affiant for a hearing, the imposition of sanctions and penalties for perjury of contempt, and dismissal of the case. Before judgment is entered on any claim for foreclosure and/or money judgment in a residential mortgage foreclosure case, counsel for plaintiff and any other party that asserts a claim for foreclosure of money judgment must file an Affidavit.

This Affidavit must:

1. Identify the counsel of record and his or her law firm.

2. Provide that the counsel of record has reviewed the file.

3. Provide that the counsel of record has communicated with a representative of the party seeking foreclosure and/or money judgment and that this representative has affirmed that he or she has personally reviewed the documents, records, or other data related to the case; has reviewed the pleadings and other court filings in the case; and has confirmed both the factual accuracy of the pleadings and court filings and the accuracy of the notarizations contained therein.

4. Provide the full name of the representative described in Item 3 and the date or dates of the communication.

5. Certify that to the best of the counsel of record's knowledge, the pleadings and other court filings in support of the claims for foreclosure are complete and accurate in all relevant respects.

6. Acknowledge that counsel of record has a continuing obligation to amend and supplement the Affidavit in light of newly discovered facts following its filing.

7. Be signed and dated by counsel of record. Failure to submit an appropriate Affidavit on or before the date of trial, the date that a motion for summary judgment is ripe for ruling, or the date of default hearing, whichever is applicable, will result in dismissal of the case and may result in further sanctions. All affidavits submitted pursuant to this order, must be in the format of these Standardized Affidavit Forms (See Exhibit 7).

1    The court allowed Plaintiffs' right to be denied of due process by not requiring the appropriate

2    jurisdiction of the defendant as they were not the owner of record and had displayed no affidavit or proof

3    of the promissory note.

4

5    Defendant's committed numerous acts of fraud upon Plaintiff's property rights, including

6    without limitations, Defendant's purposeful fraud in attempting to appear as **CREDITOR** with claim

7    upon the Plaintiffs.   In fact the Defendants are well aware they are not the **CREDITOR** and therefore

8    **NOT the Real Party in interest** in this instant matter. The Defendants have initiated a non judicial

9    foreclosure without being a **"holder in due course"** and **NOT the Real Party in interest** pending case.

10

11    It is now incumbent on this court to query Defendants as to Defendants' lawful position in this

12    instant matter. If Defendants refuse to stipulate in open court that Defendants are the **CREDITOR** in this

13    instant matter, this court must remove Defendants from **"standing"** forthwith, as this court is here to

14    settle a matter between a **CREDITOR** and a **DEBTOR.**

15

16    Accordingly, if Defendants are not the **CREDITOR** in this Matter, then Defendants have thus

17    stipulated that Plaintiff MUST be the **CREDITOR** in this matter.

18

19    Defendants cannot be the **CREDITOR** in this instant matter as Defendants NEVER risked any

20    assets, nor are Defendants holding any assets.

21

22    A **CREDITOR** cannot be a **CREDITOR** if they don't hold the asset in question, [*i.e.: the NOTE

23    and/or the property*; and **Mortgage Pass-through Trusts**, *i.e. R.E.M.I.C., as defined in TITLE 26,

24    Subtitle A, CHAPTER 1, Subchapter M, PART II, §§ 850-862]* cannot hold assets for if they do their tax

25    exempt status is violated and the Trust itself is void *ab initio*.

26    Defendant MUST NOW inform this court, the I.R.S. and the S.E.C. of their status of either being a

27    **CREDITOR** and/or not being a **CREDITOR.**

28

Defendant's own acts of fraud upon the property of the Plaintiffs in **"conversion through fraudulent means"** (See Exhibits 1, 4 and 4A) have damaged the Plaintiff and deceiving the public in general are the single cause of this paradox. In the absence of the Defendants stating their claim as **CREDITOR,** this court cannot hear from Defendants because of subject matter problems.

By Law and precedent and in accordance with the Supreme Court of the United States *pro se* Pleadings MAY NOT be held to the same standard as a lawyer's and/or attorney's; and whose motions, pleadings and all papers may ONLY be judged by their function and never their form.

***See:*** Haines v. Kerner; Platsky v. CIA; Anastasoff v. United States; Litigants are to be held to less stringent pleading standards;

***See:*** Haines v. Kerner, 404 U.S. 519-421; In re Haines: pro se litigants are held to less stringent pleading standards than admitted or licensed bar attorneys. Regardless of the deficiencies in their pleadings, pro se litigants are entitled to the opportunity to submit evidence in support of their claims.

***See also:*** Platsky v. C.I.A., 953 f.2d. 25; In re Platsky: court errs if court dismisses the pro se litigant without instruction of how pleadings are deficient and how to repair pleadings.

***See also:*** Anastasoff v. United States, 223 F.3d 898 (8th Cir. 2000); In re Anastasoff: litigants' constitutional (guaranteed) rights are violated when courts depart from precedent where parties are similarly situated.

For this matter, Defendant is and/or may be the listed Defendant, any and all parties Defendant refuses to reveal to Plaintiff and/or this Court, irrespective of whether or not said party and/or parties are known to this Court and/or Plaintiffs and/or Defendant, the Corporate *ens legis* entity Defendant is employed by and/or is an officer thereof, and/or any other parity and/or parties, indispensible or not, any and all other party and/or parties receiving any pecuniary gain from, through, and/or by Defendant's fraudulent act(s).

1        Plaintiff hereby questions the authenticity of ALL dates and/or ALL signatures by ALL parties

2  on ALL documents, including without limitations, notarized documents, "contracts", "deeds", "titles",

3  affidavits, and/or the like, including without limitations the dates and/or signatures by notary publics,

4  officers, employees, and any and ALL parties attesting to any and ALL claims, facts, accounting,

5  transfers, recordings, publications, and/or the like, etc. (See Exhibits 1, 4 and 4A)

6

7        Plaintiff disavows any and ALL implied and/or conferred and/or inferred "understanding" of

8  "*legalese*" terms now and at the time of the "signing" of any and ALL of the documents pertaining to

9  this action.

10

11        Plaintiff disavows any and ALL presumptions made by this Court, Defendant, and any and ALL

12  other parties when said presumption may be detrimental to Plaintiff's interest and/or case.

13

14        Plaintiff hereby demands ALL of Plaintiff's Rights be protected by this Court, including without

15  limitations, State and federal constitutionally protected Rights, God given Rights, Civil Rights, Human

16  Rights, Rights protected by Treaty(s), and/or ALL privileges and/or immunities, and/or the like.

17        Plaintiff hereby demands this Court refuse to commit, and act to prevent Defendant from

18  committing, any and ALL acts barbarous in nature.

19

20        Plaintiff hereby demands ALL applicable Rules of Court, Rules of Procedures, Laws, and/or

21  Statutes be adhered to without preference for any party.

22

23  **I. Plaintiff hereby alleges and/or states the claim for which relief can be granted as follows:**

24        **PLAINTIFF'S ALLEGATIONS and/or CLAIMS:**

25

26      **1.**      Plaintiff is the CREDITOR in this matter.

27      **2.**      Defendant is the DEBTOR in this matter.

28      **3.**      Defendant is not the **CREDITOR,** or an **ASSIGNEE of the CREDITOR,** in this

instant matter

4.   Plaintiff is the **DEBTOR** in this matter

5.   Defendant is not **the Real Party in Interest** in this instant matter.

6.   Defendant did NOT put Defendants' assets at risk in this instant matter.

7.   Defendant may have only "lent credit" in this instant matter.   That is considered an "ultra vires" act.

8.   Defendants purposely destroyed the GENUINE ORIGINAL PROMISSORY NOTE to "securitize" the NOTE.

9.   Defendant's use of "*legalese*" in the mortgage documents as a means of converting Real Property from its true owner to Defendant is a criminal act of "conversion through fraudulent means" and therefore the mortgage documents are evidence of a criminal act and cannot be used by this Court in this instant matter. *(See: Black's Sixth Edition; "Understand")*

10.   The United States has a primary mortgage Right and/or status on the real property in question and such CANNOT be circumvented by Defendant's fraudulent and unlawful mortgage.

11.   Defendant has been paid in full for the "contract" in question.

12.   Defendant will fail to join "all indispensible parties" as such joinder would be prima facie evidence of Defendant's fraudulent act of Securitizing the "PROMISSORY NOTE.

13.   All "investors" involved in the securitization of the "Promissory Note" are indispensible parties to this action and MUST be joined by Defendant in any rebuttal, response, reply, answer, and/or the like by Defendant.

14.   Defendant is using a corporate entity and/or TRUST in furtherance of fraudulent acts.

15.   Defendant has no immunity for Defendant's fraudulent acts.

**16.**     Defendant is jointly and severally responsible for ALL of Plaintiff's losses, cost

fees, and/or damages; *including without limitations*, emotional damages, punitive

damages, inclusive of but not limited to: alienation of affection from: spouse, boy

and/or girl "friend", friends, children, pets, co-worker(s), client(s), customer(s), and

any and all other parties effected directly and or indirectly and/or collaterally even if

caused by Plaintiff's inability to deal emotionally with the financial issues; as said

issues are and have been caused by Defendant's fraudulent acts.

Defendant MUST rebut ANY and ALL ALLEGATIONS and/or CLAIMS with specificity,

quoting facts and laws; or Defendant thereby stipulates Defendants agree with Plaintiff's

ALLEGATIONS and/or CLAIMS; and Defendants forever forsake arguing against Plaintiff's allegations

and/or claims in any court. Merely denying Plaintiff's allegations and/or claims are not sufficient to

survive a Motion for Summary judgment against Defendant.

Pursuant to F.R.Cv.P. Rule 8(b)(6) and/or all allegations and/or claims made by Plaintiff MUST

be accepted as true by this Court unless said allegations and/or claims are rebutted with a preponderance

of the evidence by Defendant. Any and all such avowries and/or averments presented by Defendant must

be *et hoc paratus est verificare* and done under penalty of perjury.

**RELIEF:**

1.     Defendant returns the **GENUINE ORIGINAL PROMISSORY NOTE** and ALL MONEY

PAID [by Plaintiff to Defendants, with a full disclosure of accounting of such] to

Plaintiff forthwith;

2.     If Defendant is not able to return the **GENUINE ORIGINAL PROMISSORY NOTE** to

Plaintiff forthwith then Defendant is therefore admitting to Defendant's unlawful attempt to

convert real property without cause and/or right.

3.     Defendant present to Plaintiff and this Court and Affidavit stipulating that Defendant has NO

RIGHTS to the real property in question.

**4.** Defendant returns DEED and all other documents pertaining to ownership of real property in question to Plaintiff.

**5.** If Defendant **does not** STATE THE CLAIM UNDER PENALTY OF PERJURY that Defendant is the **CREDITOR** in this instant matter, Defendant agrees to accept Judgment by Default in favor of Plaintiff.

**6.** If Defendant **does** STATE THE CLAIM UNDER PENALTY OF PERJURY that Defendant is the **CREDITOR** in this instant matter, Defendant agrees to deliver acknowledgement of such forthwith to the S.E.C. and the I.R.S.

**II.** **Plaintiff has the Due Process Right as protected by, *inter alia,* the Fourteenth Amendment of the federal Constitution to rely on the court adhering to, *inter alia*, and the federal and state Constitutions:**

**Federal and State Rules of Civil Procedure**

Rule of Law:

These rules govern the procedure in the Federal and State Courts in all suits of a civil nature whether cognizable as cases at law or in equity. They shall be construed to secure the just, speedy, and inexpensive determination of every action.

**III.** **Plaintiff questions the jurisdiction of any and ALL non-judicial proceedings known only to Plaintiff as an administrative procedure fraudulently based on an invalid and unenforceable confession of judgment presumption in the mortgage documents.**

Once jurisdiction is questioned the court MUST dismiss the action. Plaintiff hereby questions the jurisdiction of any and all non-judicial proceedings instigated by Defendant in Defendant's unlawful attempt to confiscate Plaintiff's real property.

Federal Rule of Waiver or Preservation of certain defenses:

A party waives all defenses and objections which that party does not present either by motion as herein before provided, or, if that party has made no motion, in that party's answer or reply, **except;**

**(3) Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.**

(*Emphasis added*)

***See:*** *McCorkle v. First Pennsylvania Banking and Trust Co. (4th Cir. 1972) 459 F.2d 243, 244.* "At any stage of a litigation, including the appellate, subject matter jurisdiction may be questioned. By failing to do so, the parties cannot confer jurisdiction by consent. If the court perceives the defect, it is obligated to raise the issue sua sponte."

***See also:*** *McCready v. White, 417 F.3d Case 1:05-cv-04743;* "Ensuring the existence of subject-matter jurisdiction is the court's first duty in every lawsuit."

Subject-matter jurisdiction is an issue that must be considered at any stage of the litigation. See 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); *United Phosphorus, Ltd. v. Angus Chem. Co., 322 F.3d 942, 946 (7th Cir. 2003); BEM I, L.L.C. v. Anthropologie, Inc., 301 F.3d 548, 551 (7th Cir. 2002)* ("[S]ubject-matter jurisdiction . . . may be questioned at any time until the litigation becomes final, and sometimes even later."). Even if the defense of lack of subject-matter jurisdiction is overruled, stricken, or excluded by the district court, it may be reasserted at any time in the action. *See: 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350, at 132 (3d ed. 2004) (citing Fahnestock v. Reeder, 223 F. Supp. 2d 618, 621 (E.D. Pa. 2002)).*

Once questioned, the Defendant and/or the court MUST prove jurisdiction BEFORE proceeding with a case. This requirement has not been abrogated nor does it exclude non-judicial proceedings.

The non-judicial foreclosure procedure requires jurisdiction as does any matter, judicial, administrative or otherwise. Defendant has attempted to circumvent jurisdiction requirements by falsely claiming Defendant has met for the court the requisite elements of jurisdiction, primarily that Defendant is the Real Party in Interest.

Defendant's claim to be the Real Party in Interest is false, fraudulent and unlawful. Pursuant to, *inter alia*, Defendant must prove Defendant is the Real Party in Interest, not just claim such.

It is a functional impossibility for Defendant to be the Real Party in Interest without the GENUINE ORIGINAL PROMISSORY NOTE. Ergo, it is a functional impossibility for Defendant to prove Defendant is the Real Party in Interest without presenting to this court the ORIGINAL PROMISSORY NOTE.

It is an incontrovertible fact that Defendant is not in possession of the GENUINE ORIGINAL PROMISSORY NOTE, and accordingly, it is an incontrovertible fact that Defendant is committing fraud upon the court by falsely and/or fraudulently claiming Defendant is in possession of the GENUINE ORIGINAL PROMISSORY NOTE.

Pursuant to law and in accordance with Plaintiff's claims; Defendants MUST present to this court the GENUINE ORIGINAL PROMISSORY NOTE and prove to be the **CREDITOR** in this agreement or agree to Plaintiff's demand for Judgment by Default in favor of Plaintiff.

This pleading is supported by the law of the case herein, the prior rulings of this Court herein, the docket of this case, all documents involving Plaintiffs and Defendants, each of which are incorporated by this reference as if fully set forth, and for each of which Plaintiff requests this Court to take Judicial Notice thereof. This pleading is further supported by the accompanying Memorandum of Points and Authorities.

1    The Plaintiff expressly reserves the right to amend or supplement this request as needed.  The

2    Plaintiff also reserves the right to have this request construed so as to do justice according to FRCP 8 (e)

3    and all other applicable law.

4

5    Dated this 18th day of March, 2011

6    By: _Mark A. Manning / agent_

7    Mark A. Manning, Pro se

8

9

10   State of California

11   County of Alameda

12   **Subscribed and sworn to** (or affirmed) before me on this 18 day of March , 20 11 , by

13   Mark A Manning , proved to me on the basis of satisfactory evidence to be the person(s) who

14   appeared before me.

15

16   Signature _____ (seal)



17       MAY HUEY-CHEUNG
         NOTARY PUBLIC - CALIFORNIA
18       COMMISSION # 1828824
         ALAMEDA COUNTY
         My Comm. Exp. January 1, 2013
19

20

21

22

23

24

25

26

27

28

[Fraudulent Adverse Possession Complaint] - 12

## MEMORANDUM OF POINTS AND AUTHORITES

### See Also Exhibit 5 -  Central Memorandum Numbered 1-11 and Other Points of Authority

Diversity of jurisdiction is present in this matter as the real property in question is in California and Defendant and/or other entities involved are in other states and/or countries. Therefore, Plaintiff hereby invokes Erie doctrine and will accordingly use federal laws and/or California laws and other states.

Defendants are committing BARRATRY by fraudulently filing documents only a **CREDTIOR** and the **Real Party in Interest** may file, when in fact Defendants are **NOT** the **CREDTIOR** and **NOT** the **Real Party in Interest** in this instant matter.

It is a functional impossibility for Plaintiff to **"understand"** the mortgage documents Defendants used in their unlawful attempt to convert Plaintiff's Real Property to Defendants' possession. Plaintiff's inability to "understand" the *"legalese"* used by the attorneys who wrote the mortgage documents prohibits Defendants from using said documents as evidence against Plaintiff.

In fact, Defendants' *malum in se* act of using *"legalese"* in a document to unlawfully convert real property is defined in law as "theft through unlawful conversion."

Defendants cannot now use said documents to convert said property without said documents being used as prima facie evidence of Defendants' felonious act.

**This court cannot use evidence of a felonious act to assist a criminal in furtherance of a felonious act.**

*See:* Black's Law Sixth Edition:

**Understand.** To know; to apprehend the meaning; to appreciate; as, to understand the nature and effect of an act. International-Great Northern R. Co. v. Pence, Tex. Civ.App., 113 S.W.2d 206, 210. To have a full and clear knowledge of; to comprehend. Thus, to invalidate a deed on the ground that the grantor did not understand the nature of the act, the grantor must be incapable of comprehending that the effect of the act would divest him of the title to the land set forth in the deed. As used in connection with the execution of wills and other instruments, the term includes the realization of the practical effects and consequences of the proposed act. *See c*apacity.

Definitions from Bouviers Law Dictionary 1856 Edition:

**BARRATRY,** crimes. In old law French barat, baraterie, signifying robbery, deceit, fraud. In modern usage it may be defined as the habitual moving, exciting, and maintaining suits and quarrels, either at law or otherwise. 1 Inst. 368; 1 Hawk. 243.

2. A man cannot be indicted as a common barrator in respect of any number of false and groundless actions brought in his own right, nor for a single act in right of another; for that would not make him a common barrator.

3. Barratry, in this sense, is different from maintenance (q.v.) and champerty. (q.v.)

**CHAMPERTY,** crimes. A bargain with a plaintiff or defendant, *campum partire*, to divide the land or other matter sued for between them, if they prevail at law, the champertor undertaking to carry on the suit at his own expense. 1 Pick. 416; 1 Ham. 32; 5 Monr. 416; 4 Litt. 117; 5 John. Ch. R. 44; 7 Port. R. 488.

2. This offence differs from maintenance, in this, that in the latter the person assisting the suitor receives no benefit, while in the former he receives one half, or other portion, of the thing sued for. See Punishment; Fine; Imprisonment; 4 Bl. Com. 135.

3. This was an offence in the civil law. Poth. Pand. lib. 3, t. 1; App. n. 1, tom. 3, p.104; 15 Ves. 139; 7 Bligh's R. 369; S. C. 20 E. C. L. R. 165; 5 Moore & P. 193; 6 Carr. & P. 749; S.C. 25 E. C. L. R. 631; 1-Russ. Cr. 179 Hawk.P. C. b.1 c.84, s.5.

4. To maintain a defendant may be champerty. Hawk. P. C. b. 1, c. 84, s. 8 3 Ham. 541; 6 Monr. 392; 8 Yerg. 484; 8 John. 479; 1 John. Ch. R. 444;, 7 Wend. 152; 3 Cowen, 624; 6 Coven, 90.

**I.      Defendants are Not the Real Party in Interest in this and the non-judicial proceeding as current possession of the GENUINE ORIGINAL PROMISSORY NOTE is a requirement for a party to be the Real Party in Interest in all proceedings pursuant to the U.C.C.:**

Defendant is not and cannot be the Real Party in Interest and is committing fraud by their unlawful foreclosure on real property owned by Plaintiff.  Absent possession of the GENUINE ORIGINAL PROMISSORY NOTE singed by Plaintiff, Defendant cannot lawfully move forward with the non-judicial process as the non-judicial court authorities do NOT have subject matter jurisdiction..... "causing" – automatic "Voided Judgment" with assuming personal and collateral damages.

**II.     Absent prima facie evidence that Defendant is the Real Party in Interest in this and the non-judicial proceeding, Defendant cannot be considered the Real Party in Interest in this and/or the non-judicial proceeding:**

The ONLY acceptable evidence that Defendant may be the Real Party in Interest is the GENUINE ORIGINAL PROMISSORY NOTE. Defendant did NOT present the GENUINE ORIGINAL PROMISSORY NOTE to the officers acting in the non-judicial procedure and therefore the non-judicial procedures claims to jurisdiction are and were fraudulent claims and are thus void..... "causing" automatic "Voided Judgment" with assuming personal and collateral damages.

**III.     Absent prima facie evidence that Defendant is the CREDITOR in this and the non-judicial proceeding, Defendant cannot be considered the CREDITOR in this and/or the non-judicial proceeding:**

The ONLY acceptable evidence that Defendant is the **CREDITOR** in this instant matter is the GENUINE ORIGINAL PROMISSORY NOTE and the accounting showing the Defendant loaning the Plaintiff the Defendants' assets. Defendant did NOT put assets at risk in this matter. Defendant did NOT present the GENUINE ORIGINAL PROMISSORY NOTE and the accounting records to the officers acting in the non-judicial procedure and therefore the non-judicial procedure "claims to jurisdiction" are and were fraudulent claims and are thus void..... "causing" – automatic "Voided Judgment" with assuming personal and collateral damages.

# EXHIBIT 5

# Central Memorandum of Law 1-11

EXHIBIT 5
CENTRAL MEMORANDUM OF LAW
1 THRU 11

1

2

3    We reserve the right to amend and expand this memorandum as discovery develops.

4    Plaintiff's Memorandum of Law

5

6    ON CREDIT LOANS AND VOID CONTRACTS
     To the Honorable Judge of Said Court:

7

8    This Memorandum with authorities, law and cases in support, will establish the following facts:
     1) Defendant and privately owned banks are making loans of credit with the intended purpose of
9    "creating" credit as "money;" 2) other financial institutions and individuals may "launder" bank
     credit that they receive directly or indirectly from privately owned banks; 3) this collective
10   activity is unconstitutional, unlawful, in violation of common law, U.S. Code and the principles of
     equity; 4) such activity and underlying contracts have long been held void by State Courts,
11   Federal Courts and the U.S. Supreme Court.

12   This Memorandum will show through authorities and established common law that credit
13   "money creation" by privately owned bank corporations is not really "money creation" at all, but
     the trade specialty and artful illusion of law merchants who use old-time trade secrets of the
14   Goldsmiths to entrap the borrower and unjustly enrich the lender through usury and other
     unlawful techniques. Issues based on law and the principles of equity, which are within the
15   jurisdiction of this Court, will be addressed.

16
     HISTORY OF MONEY AND BANKING
17   THE GOLDSMITHS

18   In his book, Money and Banking (8th Edition, 1984), Professor David R. Kamerschen writes on
19   pages 56-63: "The first bankers in the modem sense were the goldsmiths, who frequently
     accepted bullion and coins for storage... One result was that the goldsmiths temporarily could
20   lend part of the gold left with them... These loans of their customers' gold were soon replaced by
     a revolutionary technique ... When people brought in gold, the goldsmith gave them notes
21   promising to pay that amount of gold on demand.

22
     Case No.
23   Memorandum of Law - 2 -

24   The notes, first made payable to the order of the individual, were later changed to bearer
     obligations. In the previous form, a note payable to the order of Perry Reeves would be paid to
25   no one else unless Reeves had first endorsed the note... But notes were soon being used in an
     unforeseen way. The note holders found that, when they wanted to buy something, they could
26   use the note itself in payment more conveniently and let the other person go after the gold, which
     the person rarely did... The specie, then tendered to remain in the goldsmiths' vaults... The
27   goldsmiths began to realize that they might profit handsomely by issuing somewhat more notes
28   than the amount of specie they held.

1
2
3

"These additional notes would cost the goldsmiths nothing except the negligible cost of printing them, yet the notes provided the goldsmiths with funds to lend at interest... And they were to find that the profitability of their lending operations would exceed the profit from their original trade. The goldsmiths became bankers as their interest in manufacture of gold items to sell was replaced by their concern with credit policies and lending activities.

4
5
6

"They discovered early that, although an unlimited note issue would be unwise, they could issue notes up to several times the amount of specie they held. The key to the whole operation lay in the public's willingness to leave gold and silver in the bank's vaults and use the bank's notes. This discovery is the basis of modern banking."

7
8
9
10
11
12

On page 74, Professor Kamerschen further explains the evolution of the credit system: "Later the goldsmiths learned a more efficient way to put their credit money into circulation. They lent by issuing additional notes rather than by paying out in gold, in exchange for the interest bearing note received from their customer (in effect, the loan contract), they gave their own non-interest bearing note. Each was actually borrowing from the other... The advantage of the later procedure of lending notes rather than gold was that... more notes could be issued if the gold remained in the vaults... Thus, through the principle of bank note issuance banks learned to create money in the form of their own liability."

13
14
15
16
17
18

Another publication that explains modern banking as learned from the Goldsmiths is Modern Money Mechanics (5th edition 1992), published by the Federal Reserve Bank of Chicago, that states beginning on page 3: "It started with the goldsmiths..." At one time, bankers were merely middlemen. They made a profit by accepting gold and coins brought to them for safekeeping and lending the gold and coins to borrowers. But the goldsmiths soon found that the receipts they issued to depositors were being used as a means of payment. "Then bankers discovered that they could make loans merely by giving borrowers their promises to pay, or bank notes... In this way, banks began to create money ... Demand deposits are the modern counterpart of bank notes... It was a small step from printing notes to making book entries to the credit of borrowers that the borrowers, in turn, could 'spend' by writing checks, thereby printing their own money."

19
20

MODERN MONEY AND BANKING
HOW BANKS CREATE MONEY

21
22

Case No.
Memorandum of Law - 3 -

23
24
25
26

In the modern sense, banks create money by creating "demand deposits." Demand deposits are merely "book entries" that reflect how much lawful money the bank owes its customers. Thus, all deposits are called demand deposits and are the bank's liabilities. The bank's assets are the vault cash plus all the "IOUs" or promissory notes that borrowers sign when they borrow either money or credit. When a bank lends its cash (legal money), it loans its assets, but when a bank lends credit, it lends its liabilities. The lending of credit is, therefore, the exact opposite of the lending of cash (legal money).

27
28

At this point, we need to define the meaning of certain words like "lawful money," "legal tender," "other money," and "dollars."

The terms "Money" and "Tender" had their origins in Article I, Sec. 8 and Article I, Sec.10 of the Constitution of the United States. Title 12 U.S.C. 152 refers to "gold and silver coin as lawful money of the united States" and was repealed in 1994. The term "legal tender" was originally cited in 31 U.S.C.A. 392 and is now re-codified in 31 U.S.C.A. 5103 that states: "united States coins and currency... are legal tender for all debts, public charges, taxes, and dues." The common denominator in both "lawful money" and "legal tender money" is that both are issued by the United States Government.

With Bankers, however, we find that there are two forms of money – one is government-issued and the other is issued by privately owned banks such as Defendant's Bank. As we have already discussed government-issued forms of money, we need to look at privately-issued forms of money.

All privately issued forms of money today are based upon the liabilities of the issuer. There are three common terms used to describe this privately created money. They are "credit," "demand deposits" and "checkbook money." In the Fifth edition of Black's Law Dictionary, p.331, under the term "Credit," the term "Bank credit" is described as: "Money bank owes or will lend individual or person." It is clear from this definition that "Bank credit" which is the "money bank owes" is the bank's liability. The term "checkbook money" is described in the book I Bet You Thought, published by the privately owned Federal Reserve Bank of New York, as follows: "Commercial banks create checkbook money whenever they grant a loan, simply by adding deposit dollars to accounts on their books to exchange for the borrower's IOU..."

The word "deposit" and "demand deposit" both mean the same thing in bank terminology and refer to the bank's liabilities. For example, the Chicago Federal Reserve's book, Modern Money Mechanics says: "Deposits are merely book entries... Banks can build up deposits by increasing loans... Demand deposits are the modern counterpart of bank notes. It was a small step from printing notes to making book entries to the credit of borrowers which the borrowers, in turn, could 'spend' by writing checks." Thus, it is demonstrated in Modern Money Mechanics how, under the practice of fractional reserve banking, a deposit of $5,000 in cash could result in a loan of credit checkbook money/demand deposits of $100,000 if reserve ratios set by the Federal Reserve are 5% (instead of 10%).

Case No.
Memorandum of Law – 4 –

In a practical application, here is how it works. If a bank has ten people who each deposit $5,000 (totaling $50,000) in cash (legal money) and the bank's reserve ratio is 5%, then the bank will lend twenty times this amount, or $1,000,000 in "credit" money. What the bank has actually done, however, is to write a check or loan its credit with the intended purpose of circulating credit as "money." Banks know that if all the people, who receive a check or credit loan, were to come to the bank and demand cash, the bank would have to close its doors because it doesn't have the cash to bank up its check or loan. The bank's check or loan will, however, pass as money as long as people have confidence in the illusion and don't demand cash. Panics are created when people line up at the bank and demand cash (legal money), causing banks to fold as history records in several time periods.

The process of passing checks or credit as money is done quite simply. A deposit of $5,000 in cash by one person results in a loan of $100,000 to another person at 5% reserves. The person receiving the check or loan of credit for $100,000 usually deposits it in the same bank or another bank in the Federal Reserve system. The check or loan is sent to the bookkeeping department of the lending bank where a book entry of $100,000 is credited to the borrower's account. The lending bank's check that created the borrower's loan is then stamped "Paid" when the account of the borrower is credited a "dollar" amount. The borrower may then "spend" these book entries (demand deposits) by writing checks to others, who in turn deposit their checks and have book entries transferred to their account from the borrower's checking account.

However, two highly questionable and unlawful acts have now occurred. The first was when the bank wrote the check or made the loan with insufficient funds to back them up. The second is when the bank stamps its own NSF check "paid" or posts a loan by merely crediting the borrower's account with book entries the bank calls "dollars." Ironically, the check or loan seems good and passes as money - unless an emergency occurs via demands for cash – or a Court challenge – and the artful illusion bubble bursts.

DIFFERENT KINDS OF MONEY
The book I Bet You Thought, published by the Federal Reserve Bank of New York says: "Money is any generally accepted medium of exchange, not simply coin and currency. Money doesn't have to be intrinsically valuable, be issued by a government or be in any special form." [Emphasis added.] Thus, we see that privately issued forms of money only require public confidence in order to pass as money. Counterfeit money also passes as money as long as nobody discovers it is counterfeit. Likewise, "bad" checks and "credit" loans pass as money as long as no one finds out they are unlawful. Yet, once the fraud is discovered, the value of such "bank money," like bad checks, ceases to exist. There are, therefore, two kinds of money - government-issued legal money and privately-issued unlawful money.

DIFFERENT KINDS OF DOLLARS

Case No.
Memorandum of Law - 5 -
The dollar once represented something intrinsically valuable made from gold or silver. For example, in 1792 Congress defined the silver dollar as a silver coin containing 371.25 grains of pure silver. The legal dollar is now known as "United States coins and currency." However, the Banker's dollar has become a unit of measure of a different kind of money. Therefore, with Bankers there is a "dollar" of coins and a "dollar" of cash (legal money), a "dollar" of debt, a "dollar" of credit, a "dollar" of checkbook money or a "dollar" of checks. When one refers to a dollar spent or a dollar loaned, he should now indicate what kind of "dollar" he is talking about, since Bankers have created so many different kinds.

A dollar of bank "credit money" is the exact opposite of a dollar of "legal money". The former is a liability while the latter is an asset. Thus, it can be seen from the earlier statement quoted from I Bet You Thought, that money can be privately issued as: "Money doesn't have to... be issued by a government or be in any special form." It should be carefully noted that banks that issue and lend privately created money, demand to be paid with government issued money. However, payment in like kind under natural equity would seem to indicate that a debt created by a loan of privately created money can be paid with other privately created money, without regard for "any special

form" as there are no statutory laws to dictate how either private citizens or banks may create money.

**BY WHAT AUTHORITY??**
By what authority do state and national banks, as privately owned corporations, create money by lending their credit - or more simply put, by writing and passing "bad" checks and "credit" loans as "money"? Nowhere can a law be found that gives banks the authority to create money by lending their liabilities.

Therefore, the next question is: If banks are creating money by passing bad checks and lending their credit, where is their authority to do so? From their literature, banks claim these techniques were learned from the trade secrets of the Goldsmiths. It is evident, however, that money creation by private banks is not the result of powers conferred upon them by government, but rather the artful use of long held "trade secrets." Thus, unlawful money creation is not being done by banks as corporations, but unlawfully by bankers.

Article 1, Section 10, para. 1 of the Constitution of the United States specifically states that no state shall... coin money, emit bills of credit, make any Thing but gold and silver coin a Tender in Payment of Debts, pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligations of Contracts..."[Emphasis added.] The states that grant the Charters of state banks also prohibit the emitting of bills of credit by not granting such authority in bank charters.

It is obvious that "We the people" never delegated to Congress, state government, or agencies of the state, the power to create and issue money in the form of checks, credit, or other "bills of credits." The Federal Government today does not authorize banks to emit, write, create, issue and pass checks and credit as money, but banks do, and get away with it.

Case No.
Memorandum of Law - 6 -
Banks assign their privately created money more misleading names, like "credit," "demand deposits," or "checkbook money." However, the true nature of "credit money" and "checks" does not change regardless of the deceptive terminology used to describe them. Such money in common use by privately owned banks is illegal under Article 1, Sec. 10, para.1 of the Constitution of the United States as well as unlawful under the laws of the United States.

**VOID "ULTRA VIRES" CONTRACTS**
Black's Law Dictionary defines the Latin term "extra vires" to mean beyond powers. Black's Law Dictionary explains the term "ultra vires" embraces "[a]n act performed without any authority to act on subject. Haslund v. City of Seattle, 86 Wash.2d 607, 547 P.2d 1221, 1230. Acts beyond the scope of the powers of a corporation, as defined by its charter or laws of state of incorporation. State ex rel. v. Holston Trust Col, 168 Tenn. 546, 79 S.W.2d 1012, 1016. The term has a broad application and includes not only acts prohibited by the charter, but acts which are in excess of powers granted and not prohibited, and generally applied either when a corporation has no power whatever to do an act, or when the corporation has the power, but exercises it irregularly. People ex rel. Barrett v. Bank of Peoria, 295 Ill.App. 543, 15 N.E.2d 333, 335. Act is ultra vires when corporation is without authority to perfom it under any circumstances or for any purpose.
By doctrine of ultra vires, a contract made by a corporation beyond the scope of its corporate powers is unlawful. Community Federal Sav. & Loan Ass'n of Independence, Mo. v. Fields,

C.C.A., Mo., 128 F.2d 705, 708." Black's 6th Edition, p. 1522. The courts have long held that when a corporation executes a contract beyond the scope of its charter or granted corporate powers, the contract is void or "ultra vires". See infra, Pullman v. Central Transp. Co., 139 U.S. 62, 11 S.Ct. 478, 35 L.Ed. 55.

THE QUESTION OF LAWFUL CONSIDERATION

The issue of whether the lender, who writes and passes a "bad" check or makes a "credit" loan, has a claim for relief against the borrower is easy to answer, providing the lender can prove that he gave a lawful consideration based upon lawful acts, but did the lender give a lawful consideration? To give a lawful consideration, the lender must prove that he gave the borrower lawful money such as coins or currency. Failing that, he can have no claim for relief in a court at law against the borrower as the lender's actions were Ultra vires or void from the beginning of the transaction.

It can be argued that "bad" checks or "credit" loans, that pass as money, are valuable, but so are counterfeit coins and currency that pass as money. It seems unconscionable that a bank would ask homeowners to put up a homestead as collateral for a "credit loan" that the bank created out of thin air. Would a court of law or equity allow a counterfeiter to foreclose against a person's home because the borrower was late in payments on an unlawful loan? If the court were to do so, it would be contrary to all principles of law.

Case No.

Memorandum of Law -7-

The question of valuable consideration does not depend on any value imparted by the lender, but by false confidence instilled in the "bad" check or "credit" loan by the lender. In a court at law or equity, the lender has no claim for relief. The argument that the lender has a claim for relief because the borrower received property for the lender's "bad" check or "credit" loan, is not valid unless the lender can prove that he gave lawful value. The claim for relief lies with the seller, who may be holding the "bad" check or "credit" loan, against the lender or the borrower, or both.

BORROWER RELIEF

Since we have established that the lender of unlawful or counterfeit money has no claim for relief under a void contract, the last question is, does the borrower have a claim for relief against the lender?

First, if it is established that the borrower has made no payments to the lender, then the borrower has no claim for relief against the lender for money damages, but the borrower has a claim for relief to void the debt he owes the lender for notes or obligations unlawfully created by an Ultra vires contract for lending "credit" money.

The borrower, the Courts have long held, has a claim for relief against the lender to have the note, security agreement, or mortgage note the borrower signed, declared null and void. The borrower may also have claims for relief for breach of contract by the lender for not lending "lawful money" and for usury for charging an interest rate several times greater than the amount agreed to in the contract for any lawful money actually risked by the lender.

For example, if on a $100,000 loan it can be established that the lender actually risked only $5,000 (5% Federal Reserve ratio) with a current interest rate of 10%, the lender has then loaned $95,000 of "credit" and $5,000 of "lawful money" while charging 10% interest ($10,000) on the entire $100,000. The true interest rate on the $5,000 of "lawful money" actually risked by the lender is 200%, which violates Usury laws. If no "lawful money" was loaned, then the interest rate is an infinite percentage. Such techniques, the bankers say, were learned from the trade secrets of the Goldsmiths.

The Courts say that such contracts with borrowers are wholly void from the beginning of the transaction because banks are not granted powers to enter into such contracts by either state or national charters.

ADDITIONAL BORROWER RELIEF

In District Court, the borrower may have additional claims for relief under "Civil RICO" Federal Racketeering laws (Title 18 U.S.C. 1964) as the lender may have established a "pattern of racketeering activity" by using the U.S. Mail more than twice to collect an unlawful debt and the lender may be in violation of Title 18 U.S.C. 1341, 1343, 1961 and 1962. The borrower may have other claims for relief if he can prove there was or is a conspiracy to deprive him of property without due process of law under Title 42 U.S.C. 1983 (Constitutional injury), 1985 (Conspiracy) and 1986 ("Knowledge" and "Neglect to Prevent" a U.S. Constitutional Wrong). Under Title 18 U.S.C.A. 241 (Conspiracy), violators "shall be fined not more than $10,000 or imprisoned not more than ten (10) years or both."

Case No.
Memorandum of Law - 8 -
CASE CITES IN SUPPORT
ULTRA VIRES CONTRACTS

1. "A contract is ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it. The courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the defendant to return, or failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm the unlawful contract." Pullman v. Central Transp. Co., 139 U.S. 62, 11 S.Ct. 478, 35 L.Ed. 55

2. "When a contract is once declared ultra vires, the fact that it is executed does not validate it, nor can it be ratified, so as to make it the basis of suit or action, nor does the doctrine of estoppels apply." F&PR v. Richmond, 133 SE 898; 151 Va. 195.

3. "A national bank... cannot lend its credit to another by becoming surety, indorser or guarantor for him, such an act is ultra vires..." Merchants Bank v. Baird, 160 F 642.

LOAN OF CREDIT

4. "In the federal courts, it is well established that a national bank has not power to lend its credit to another by becoming surety, endorser, or guarantor for him." Farmers and Miners Bank v. Bluefield Nat'l Bank, 11 F.2d 83, 271 U.S. 669.

5. "A national bank has no power to lend its credit to any person or corporation." Bowen v. Needles Nat. Bank, 94 F. 925; 36 CCA 553, certiorari denied In 20 S.Ct. 1024, 176 US 682, 44 L.Ed 637.

6. "Mr. Justice Marshall said: 'The doctrine of ultra vires is a most powerful weapon to keep private corporations within their legitimate spheres and to punish them for violations of their corporate charters, and it probably is not invoked too often...'"Zinc Carbonate Co. v. First National Bank, 103 Wis. 125, 79 NW 229, American Express Co. v. Citizens State Bank, 194 NW 430.

7. "A bank may not lend its credit to another, even though such a transaction turns out to have been of benefit to the bank, and in support of this, a list of cases might be cited, which would look like a catalog of ships." Norton Grocery Co. v. Peoples Nat. Bank, 144 SE 505, 151 Va 195.

Case No.
Memorandum of Law - 9 -

8. "It has been settled beyond controversy that a national bank, under federal law being limited in its powers and capacity, cannot lend its credit by guaranteeing the debts of another. All such contracts entered into by its officers are ultra vires..." Howard & Foster Co. v. Citizens Nat'l Bank of Union, 133 SC 202, 130 SE 759 (1926).

9. "... checks, drafts, money orders and bank notes are not lawful money of the United States..." State v. Neilon, 73 Pac. 324, 43 Ore. 168.

10. "Neither, as included in its powers, nor incidental to them, is it a part of a bank's business to lend its credit. If a bank could lend its credit as well as its money, it might, if it received compensation and was careful to put its name only to solid paper, make a great deal more than any lawful interest on its money would amount to. If not careful, the power would be the mother of panics... Indeed, lending credit is the exact opposite of lending money which is the real business of a bank, for while the latter creates a liability in favor of the bank, the former gives rise to a liability of the bank to another." 1 Morse, Banks and Banking, 5th Ed.Sec. 65; Magee, Banks and Banking, 3rd Ed. Sec. 248." American Express Co. v. Citizens State Bank, 194 NW 429.

11. "It is not within those statutory powers for a national bank, even though solvent, to lend its credit to another in any of the various ways in which that might be done." Federal Intermediate Credit Bank v. L. Herrison, 33 F.2d 841, 842 (1929).

12. "There is no doubt but what the law is that a national bank cannot lend its credit or become an accommodation endorser." National Bank of Commerce v. Atkinson, 56 F. 471.

13. "A bank can lend its money, but not its credit." First Nat'l Bank of Tallapoosav. Monroe, 135 Ga 614, 69 F. 1124, 32 LRA (NS) 550.

14. "...the bank is allowed to lend money upon personal security, but it must be money that it loans, not its credit. Sellgman v. Charlottesville Nat. Bank, 3 Hughes 647, Fed. Case No.12 642, 1039.

## LOANS OF MONEY
15. "A loan may be defined as the delivery by one party to, and the receipt by another party of, a sum of money upon an agreement express or implied, to repay the sum with or without interest." Parsons v. Fox, 179 Ga 605, 176 SE 644. Also see Kirkland v. Bailey, 155 SE 2d 701, and United States v. Neifert White Co., 247 Fed. Supp. 878, 879.

"The word 'money' in its usual and ordinary acceptation means gold, silver, or paper money used as a circulating medium of exchange..." e.v. Railey 280 Ky 319, 133 SW 2d 75.

## PROMISE TO PAY NOT EQUIVALENT TO PAYMENT
Case No.
Memorandum of Law -10 -
16. "A promise to pay cannot, by argument, however ingenious, be made the equivalent of actual payment..." Christensen v. Beebe, 91 P 133, 32 Utah 406.

17. "A check is merely an order on a bank to pay money." Young v. Hembree, 73 P 2d 393.

## HOLDER IN DUE COURSE
18. "A bank is not the holder in due course upon merely crediting the depositor's account." Bankers Trust v. Nagler, 229 NYS 2d 142, 143.

## FRAUD AND MISREPRESENTATION
19. "Any false representation of material facts made with knowledge of falsity and with intent that it shall be acted on by another in entering into contract, and which is so acted upon, constitutes 'fraud,' and entitles party deceived to avoid contract or recover damages." Barnsdall Refining Corp. v. Bimarn Wood Oil Co., 92 F.2d S17.

20. "Any conduct capable of being turned into a statement of fact is representation. There is no distinction between misrepresentations effected by words and misrepresentations effected by other acts." Leonard v. Springer, 197 Ill 532, 64 NE 301.

21. "It is not necessary for rescission of a contract that the party making the misrepresentation should have known that it was false, but recovery is allowed even though misrepresentation is innocently made, because it would be unjust to allow one who made false representations even innocently to retain the fruits of a bargain induced by such representations." Whipp v. Iverson, 43 Wis.2d 166. CONSIDERATION

22. "If any part to the consideration for a promise be illegal, or if there are several considerations for an unseverable promise, one of which is illegal, the promise, whether written or oral, is wholly void, as it is impossible to say what part or which one of the considerations induced the promise." Menominee River Co. v. Augustus Spies L&C Co., 147 Wis 559, 572; 132 NW 1122. "The contract is void if it is only in part connected with the illegal transaction and the promise single or entire." Guardian Agency v. Guardian Mut. Savings Bank, 227 Wis. 550, 279 NW 83.

RICO

23. In a Debtor's RICO action against its creditor, alleging that the creditor had collected an unlawful debt, an interest rate (where all loan charges were added together) that exceeded, in the language of the RICO Statute, "twice the enforceable rate," the Court found no reason to impose a requirement that the Plaintiff show that the Defendant had been convicted of collecting an unlawful debt, running a "loansharking" operation. The debt included the fact that exaction of a usurious interest rate rendered the debt unlawful and that is all that is necessary to support the Civil RICO action. Durante Bros. & Sons, Inc. v. Flushing Nat. Bank, 755 F.2d 239, cert. denied, 473 US 906 (1985).

Case No.
Memorandum of Law - 11 -

24. The Supreme Court found that the Plaintiff in a civil RICO action need establish only a criminal "violation" and not a criminal conviction. Further, the Court held that the Defendant need only have caused harm to the Plaintiff by the commission of a predicate offense in such a way as to constitute a "pattern of Racketeering activity". That is, the Plaintiff need not demonstrate that the Defendant is an organized crime figure, a mobster in the popular sense, or that the Plaintiff has suffered some type of special Racketeering injury; all that the Plaintiff must show is what the Statute specifically requires. The RICO Statute and the civil remedies for its violation are to be liberally construed to effect the Congressional purpose as broadly formulated in the statute. Sedima, SPRL v. Imrex Co., 473 US 479 (1985).

FEDERAL RESERVE BANK

25. "Each Federal Reserve bank is a separate corporation owned by commercial banks in its region..." Lewis v. United States, 680 F.2d 1239 (1982).

Respectfully submitted.

HOPE RENEWED
Mark A. Manning
1152 98th Ave
Oakland, CA. 94603

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

HOPE RENEWED                              )   Case No.:
                                          )
Mark A. Manning, Pro se                   )
                                          )
                                          )
        Plaintiff,                        )   NOTICE AND A DEMAND FOR JUSTICE
                                          )
    vs.                                   )
                                          )
BAC HOME LOANS SERVICING, LP              )
                                          )
  and JOHN DOES                           )
                                          )
(Investors) 1-10,000                      )
                                          )
                                          )
        Defendant                         )
                                          )
                                          )
                                          )
                                          )
                                          )

NOTICE AND A DEMAND FOR JUSTICE

I, Mark A. Manning, a flesh-and-blood man, a human being, an Authorized Representative and

Agent for HOPE RENEWED and MARK A. MANNING, sui juris, Ingenuitas et de jure, a State

National citizen and NOT a Federal Zone citizen, under a special appearance of Propria Persona,

Without Prejudice, under the Uniform Commercial Code, UCC 1-207, UCC 1-103, and UCC 3-402, have

first hand knowledge of the facts stated herein, being of majority in age, and competent in mind and

body to testify, a self realized free man upon the land, my yeses are yes, my nos are no, declare and affirm the facts stated herein are true, correct, not misleading, and admissible as evidence, in all material fact, not misrepresented and are made pursuant to the Laws of the Union of states of America and the California Republic, so help me Jahuwah.

The essence of Due Process Rights are procedural and substantive rights. Procedural Due Process is fundamental fairness. de Koevend v. Board of Educ., 688 P.2d 219, 227 (Colo.1984). The parties have a right to be heard when their rights are affected, and in order to enjoy this right they must first be notified. City of Chicago v. American National Bank & Trust Co. (1988), 171 Ill. App. 3d 680, 688, 121 Ill. Dec. 608, 525 N.E.2d 915. Due process requires, at a minimum, notice and the opportunity for a meaningful hearing before an impartial tribunal. Mathews v. Eldridge, 424 U.S. 319, 333, 348-49 (1976). Any proceeding in front of a biased judge is a violation of Due Process. A judge who is not impartial is a structural error. Structural error requires a conviction be overturned. Brecht v. Abrahamson, 113 S. Ct. 1710, 1717 (1993).

No man or woman in this country is above the law. All officers of the government, officer of the court, and all members of the court are bound to obey it. Davis v. Passman, 99 S. Ct. 2264, 2277 (1979); Butz v. Economou, 98 S. Ct. 2894, 2910 (1978).

No person, not even the President, is above the law. United States v. Fromme, 405 F. Supp. 578 (E.D. CA 1975).

Judges are not above the law. United States v. Isaacs, 493 F.2d 1124, 1143 (7th Cir. 1974). Judges themselves must not be lawless; they must follow the substantive law they are intended to administer. Horflich, *Regulation of Judicial Misconduct*, 2 Law and History Review 79, 80 (1984).

"Where rights secured by the Federal Constitution are involved, there can be no rule-making or legislation which would abrogate them." Miranda v. Arizona, 384 US 436 (1966).

"An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is in legal contemplation, as inoperative as though it had never been passed." Norton v. Shelby County, 118 US 425 (1885).

The Supreme Court has ruled and has reaffirmed the principle "**justice must satisfy the appearance of justice**," Levine V. United States, 362 U.S. 610, 80 S. Ct. 1038 (1960), citing Afoot v. United States, 348 U.S. 11, 14, 75 S. Ct. 11, 13 (1954).

The Court has stated, "It is important, the litigant not only **actually receive justice**, but he believes he has received justice." Pfizer Inc. v. Lord, 456 F.2d 532 (8th Cir. 1972).

**Neither actual Dishonesty of purpose nor intent to Deceive is an essential element Of Constructive Fraud**. Morrison v. Back Yard Burgess, Inc., 91 F.3d 1184.1187.1188 (8th Cir. 1996).

Whenever any Officer of the Court commits **Fraud** during court proceeding, he or she is engaged in "**Fraud upon the Court**," as has happened in the past. Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985).

Under State and Federal law, when any Officer of the Court has committed "**Fraud upon the Court**," the orders and judgments of the court **are VOID**, and of **no legal force** or effect.

**Fraud** in its elementary **common law sense is deceit** ... includes the deliberate concealment of material information in a setting of fiduciary obligation. Public officials and officers of the court have a fiduciary obligation toward the public, ... and if they deliberately conceal or withhold material information from the public they are guilty of **Fraud**. McNally v. U.S., 483 U.S. 350, 371-372; U.S. v Holzer, 816 F.2d. 304, 307.

"Attorneys are officers of the court, and when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath." Snelsor v. Kaiser. 81 F.3d 1492,1501 (10th Cir. 1996).

28 USC § 144 and § 455 discussion – Judicial remarks during the course of trial displaying deep-seated favoritism or antagonism as to make fair judgment impossible. Liteky v. United States. 114S.CI. 1147.1157(1994).

One who alleges bias must overcome a presumption of honesty and integrity in those serving as adjudicators. Hash v. Justices of Supreme Court of California. 67 F.3d 708, 713 (9th Cir. 1995) (S. Ct. cites).

Whenever any officer of the court commits fraud during a proceeding in the court, he/she is engaged in "fraud upon the court."

The Original 1776 united States Constitution and the California Constitution are based upon honesty in government, in courts, and in everyday life. Being a child of the living God, I demand and insist all proceedings from the start be honest and just, free of deceit, fraud, half-truths, misleading information, intentional omitting facts and information, lies of all sort and kind, fraudulent claims, inaccuracies of word and deeds, bias, favoritism, improper utterances by attorneys and judges, imply bias, dishonesty, fair and honest treatment of all parties, justice, and no prejudicious. This includes all members of the court, the judge, the district attorney(s), all defendants, all plaintiffs, all police, all witnesses, and all attorneys. This means everyone connected or associated with this case.

The Court has stated, "It is important, the litigant not only **actually receive justice**, but he believes he has received justice." Pfizer Inc. v. Lord, 456 F.2d 532 (8th Cir. 1972).

1

The Supreme Court has ruled and has reaffirmed the principle "justice must satisfy the appearance of justice," Levine v. United States, 362 U.S. 610, 80 S. Ct. 1038 (1960), citing Offutt v. United States, 348 U.S. 11, 14, 75 S. Ct. 11, 13 (1954).

2

3

4

5

Please be advised, if you do not submit a point by point written response signed under penalty of perjury and unlimited liability filed with the court within ten (10) calendar days from the date of this document, the Defendant and the judge admit, concur, and agree with all of the points raised by the Plaintiff. All parties understand and agree the Plaintiff is moving pursuant to the UCC of the State of California at Article 9, causing their Notice of Default and Dishonor to be serviced upon the Defendant identified above. This action is within the Admiralty ab initio as defined at 28 USC §1333 or §1337. All remedies are available to the Plaintiff in law and equity in both administrative and judicial processes.

6

7

8

9

10

11

12

13

14

Further Plaintiff saith naught.

15

16

Reserving All Rights, Giving Up None

17

18

Notice to agent is notice to principal. Noted to principal is notice to agent.

19

Without Prejudice, UCC 1-207 & UCC 1-308                    18th March 2011

20

21

By: Mark - A.; Manning                    agent

22

23

_____, In

Propria Persona Sui Juris A Free Man, Sovereign American, with Constitutional Rights intact UCC § 3-402 (b)(1)

24

25

26

27

28

The Plaintiff expressly reserves the right to amend or supplement this request as needed.  The Plaintiff also reserves the right to have this request construed so as to do justice according to FRCP 8 (e) and all other applicable law.

State of California

County of Alameda

**Subscribed and sworn to** (or affirmed) before me on this ___ day of _Marcl___ , 20 ___, by

_Mark A Munning___ , proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____ (seal)

```
MAY HUEY-CHEUNG
NOTARY PUBLIC - CALIFORNIA
COMMISSION . # 1828824
ALAMEDA COUNTY
My Comm. Exp. January 1, 2013
```

# EXHIBIT 1

# Trustee's Deed Upon Sale

RECORDING REQUESTED BY:
**RECONTRUST COMPANY**
AND WHEN RECORDED MAIL TO:
**RECONTRUST COMPANY**
1800 Tapo Canyon Rd., CA6-914-01-94
SIMI VALLEY, CA 93063

Forward Tax Statements to Address listed above

DOCUMENT: 20799938 | Pages: 3

| Fees . | 21.00 |
| Taxes . | |
| Copies. | |
| AMT PAID | 21.00 |

REGINA ALCOMENDRAS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Recording Service

RDE # 004
8/02/2010
10:42 AM

SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No. 10-0033106
Title Order No. 100145801

"This instrument is being recorded as an
ACCOMMODATION ONLY, with no
representation as to its effect upon title"

## TRUSTEE'S DEED UPON SALE

APN#    773-15-007-00

TRANSFER TAX:$

The Grantee herein was the beneficiary
The amount of the unpaid debt was $ 1,076,784.72
The amount paid by the Grantee was $ 660,150.00
The property is in the city of MORGAN HILL, County of SANTA CLARA

1st position
Chambers

RECONTRUST COMPANY, N.A., as the duly appointed Trustee (or successor Trustee or substituted Trustee), under a Deed of Trust referred to below, and herein called "Trustee", does hereby grant without covenant or warranty to:

BAC HOME LOANS SERVICING, LP FKA COUNTRYWIDE HOME LOANS SERVICING LP

herein called Grantee, the following described real property situated in SANTA CLARA County, California:

SEE ATTACHED LEGAL DESCRIPTION    *Schedule c*

This conveyance is made pursuant to the powers conferred upon Trustee by the Deed of Trust executed by JEFF VELIQUETTE, AND SALLY VELIQUETTE, HUSBAND AND WIFE AS COMMUNITY PROPERTY, as Trustor, recorded on 04/15/2005, Instrument Number 18326022 ( or Book , Page ) Official Records in the Office of the County Recorder of SANTA CLARA County.

All requirements of law regarding the recording and mailing of copies of the Notice of Default and Election to Sell, and the recording, mailing, posting, and publication of the Notice of Trustee's Sale have been complied with.

*1st Position*

Form trsteedeed (01/09)

TS No. 10-0033106

Title Order No. 100145801

Trustee, in compliance with said Notice of Trustee's Sale and in exercise of its power under said Deed of Trust sold said real property at public auction on 07/27/2010. Grantee, being highest bidder at said sale became the purchaser of said property for the amount bid, which amount was $ 660,150.00.



DATE:    July 27, 2010                          RECONTRUST COMPANY, N.A.


                                                BY:_____
                                                    Renee Friedman, Assistant Secretary

State of California                 }

County of Ventura                   }

        JUL 2 9 2010
On _____ before me, _____RJ GREEAR_____, notary public, personally appeared
__RENEE FRIEDMAN_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct. WITNESS my hand and official seal.

Signature _____ (Seal)
                        RJ GREEAR

```
        R. J. GREEAR
         COMM. #1784051
   NOTARY PUBLIC – CALIFORNIA
        VENTURA COUNTY
   My Commission Exp. Dec. 8, 2011
```

*Form trsteedeed (01/09)*

## SCHEDULE C

### LEGAL DESCRIPTION

All that certain real property situate in the Unincorporated Area, County of Santa Clara, State of California, described as follows:

Parcel 3, as shown on that certain Map entitled, "PARCEL MAP", which Map was filed for record in the office of the Recorder of the County of Santa Clara, State of California, in Book 291 of Maps at Page(s) 2.

# EXHIBIT 2

# Deed of Trust

Recording Requested By:
M. KEMLER

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
MELISSA BAUTISTA

[Space Above This Line For Recording Data]

11329831001                                  00726970004005
[Escrow/Closing #]                           [Doc ID #]

# DEED OF TRUST

MIN 000057-0005011824-5

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated APRIL 11, 2005          , together with all Riders to this document.

**(B) "Borrower"** is
JEFF VELIQUETTE AND SALLY VELIQUETTE, HUSBAND AND WIFE AS COMMUNITY PROPERTY

CALIFORNIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 16                                              Initials:
VMP -5A(CA) (0207)    CHL (09/02)(d)    VMP MORTGAGE FORMS · (800)521-7291          Form 3005  1/01
CONV/VA





* 2 3 9 9 1 *          * 0 9 7 2 6 9 7 0 0 0 0 0 0 0 0 1 0 0 6 A *

DOC ID #: 0009726970004005

Borrower's address is
14949 HEATHER DRIVE, SAN JOSE, CA 95124
Borrower is the trustor under this Security Instrument.
(C) "Lender" is
AMERICA'S WHOLESALE LENDER
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
P.O. Box 10219, Van Nuys, CA 91410-0219
(D) "Trustee" is
CTC FORECLOSURE SERVICES CORPORATION
155 N. LAKE AVENUE, PASADENA, CA 91109-7137 ,
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated APRIL 11, 2005          . The Note states that Borrower owes Lender
ONE MILLION and 00/100

Dollars (U.S. $ 1,000,000.00       ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MAY 01, 2035        .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |
| | | 0 |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

Initials: [signature]

DOC ID #: 0009726970004005

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
SANTA CLARA
COUNTY                           of                    [Name of Recording Jurisdiction]
[Type of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of

Parcel ID Number: 07 5007
                        2155 DAHLBERG COURT, MORGAN HILL
                                          [Street/City]

California       95037        ("Property Address"):
          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

Initials: [signature]

Form 3005 1/01

-6A(CA) (0207)          CHL (09/02)              Page 3 of 16

DOC ID #: 0009726970004005

but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

Initials: _____

Form 3005 1/01

DOC ID #: 0009726970004005

   **3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

   Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

   The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

   If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

   Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

Initials: W SV

-6A(CA) (0207)    CHL (09/02)    Page 5 of 16    Form 3005 1/01

DOC ID #: 0009726970004005

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of

Initials:

DOC ID #: 0009726970004005

paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

DOC ID #: 0009726970004005

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

Initials: [signature]

DOC ID #: 0009726970004005

shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security

Initials: [handwritten initials]

-6A(CA) (0207)        CHL (09/02)        Page 9 of 16        Form 3005 1/01

DOC ID #: 0009726970004005

Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

DOC ID #: 0009726970004005

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

Initials:

Form 3005 1/01

DOC ID #: 0009726970004005

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in

Initials: [handwritten initials]

-6A(CA) (0207)       CHL (09/02)       Page 12 of 16       Form 3005 1/01

DOC ID #: 0009726970004005

compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

DOC ID #: 0009726970004005

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

DOC ID #: 0009726970004005

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                 JEFF VELIQUETTE                -Borrower

_____        _____ (Seal)
                                 SALLY VELIQUETTE               -Borrower

                                 _____ (Seal)
                                                                -Borrower

                                 _____ (Seal)
                                                                -Borrower



DOC ID #: 0009726970004005

State of California
County of Santa Clara } ss.

On 4-12-5 before me, RHMessimer personally appeared

Jeff Veliquette and Emily Veliquette

, ~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

Prepared by: MELISSA BAUTISTA

**AMERICA'S WHOLESALE LENDER**

Branch #: 0000927
910 E. HAMILTON AVENUE #110
CAMPBELL, CA 95008
Phone: (408)558-7700
Br Fax No.: (408)369-8271

DATE:        04/11/2005
CASE #:
DOC ID #:    0009726970004005
BORROWER: JEFF VELIQUETTE
PROPERTY ADDRESS: 2155 DAHLBERG COURT
                  MORGAN HILL, CA 95037

## LEGAL DESCRIPTION EXHIBIT A





FHA/VA/CONV
• Legal Description Exhibit A
1C404-XX (04/03)(d)



* 2 3 9 9 1 *

* 0 9 7 2 6 9 7 0 0 0 0 0 0 0 1 0 0 6 A *

11329831 -001 -GH

**Exhibit A**
**Legal Description**

All that certain real property situate in the Unincorporated Area, County of Santa Clara, State of California, described as follows:

Parcel 3, as shown on that certain Map entitled, "PARCEL MAP", which Map was filed for record in the office of the Recorder of the County of Santa Clara, State of California, in Book 291 of Maps at Page(s) 2.





Assessor's Parcel Number:

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Prepared By:
MELISSA BAUTISTA

Recording Requested By:



———————— [Space Above This Line For Recording Data] ————————

# FIXED/ADJUSTABLE RATE RIDER
**(LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)**

11329831001                  0009726970004005
[Escrow/Closing #]              [Doc ID #]

CONV
• MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
  INTEREST ONLY                                                      Initials: _____
1U796-XX (06/04)(d)                   Page 1 of 5

* 2 3 9 9 1 *                      * 0 9 7 2 6 9 7 0 0 0 0 0 0 0 1 U 7 9 6 *

DOC ID #: 0009726970004005

THIS FIXED/ADJUSTABLE RATE RIDER is made this ELEVENTH           day of
APRIL, 2005         , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to
AMERICA'S WHOLESALE LENDER

("Lender") of the same date and covering the property described in the Security Instrument and
located at:

2155 DAHLBERG COURT
MORGAN HILL, CA 95037
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT
ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:
**A. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of        6.000 %. The Note also provides
for a change in the initial fixed rate to an adjustable interest rate, as follows:
**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
   The initial fixed interest rate I will pay will change to an adjustable interest rate on the
first           day of MAY, 2015           , and the adjustable interest rate I will pay
may change on that day every 12th month thereafter. The date on which my initial fixed interest rate
changes to an adjustable interest rate, and each date on which my adjustable interest rate could
change, is called a "Change Date."
   **(B) The Index**
   Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The
"Index" is the average of interbank offered rates for one year U.S. dollar-denominated deposits in the
London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure
available as of the date 45 days before each Change Date is called the "Current Index".
   If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information. The Note Holder will give me notice of this choice.
   **(C) Calculation of Changes**
   Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO & ONE-QUARTER           percentage points (      2.250 %) to the Current Index.
the Note Holder will then round the result of this addition to the nearest one-eighth of one percentage
point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new
interest rate until the next Change Date.

CONV
• MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
  INTEREST ONLY
1U796-XX (06/04)                     Page 2 of 5                     Initials:

DOC ID #: 0009726970004005

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.000 % or less than 2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.000 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

DOC ID #: 0009726970004005

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.



If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

CONV
MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
INTEREST ONLY
1U796-XX (06/04)                    Page 4 of 5                    Initials:

DOC ID #: 0009726970004005

    If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

    BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
J____ ____QUETTE                       -Borrower

_____ (Seal)
SALLY VELIQUETTE                       -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

CONV
• MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
INTEREST ONLY
1U796-XX (06/04)                    Page 5 of 5

# EXHIBIT 3

# Quit Claim Deed

DOCUMENT: 20866046

Pages: 1

| Fees | 45.00 |
| Taxes | 784.85 |
| Copies | 12.00 |
| AMT PAID | 841.85 |

RECORDING REQUESTED BY

HOPE RENEWED

AND WHEN RECORDED MAIL TO

| Name | HOPE RENEWED |
| Street | c/o 4005 Manzanita Avenue, 6-434 |
| Address | |
| City | Carmichael, California 95608 |
| State, Zip | |

REGINA ALCOMENDRAS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Grantee

RDE # 010
9/13/2010
10:51 AM

APN: 773-15-007

SPACE ABOVE LINE FOR RECORDER'S USE

The undersigned Grantor(s) declare(s):

Documentary transfer tax is $ -0- RT 11911 Consideration does not exceed $100.
( ) computed on full value of property conveyed, or
( ) computed on full value less value of liens and encumbrances remaining at time of sale
( ) Unincorporated area: ( ) City of _____

## QUIT CLAIM DEED

FOR VALUABLE CONSIDERATION OF TWENTY-ONE DOLLARS ($21.00), and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, JEFF VELIQUETTE, AND SALLY VELIQUETTE, HUSBAND AND WIFE AS COMMUNITY PROPERTY, hereinafter referred to as "Grantors", do hereby convey, remise, release and forever quitclaim to HOPE RENEWED, a California Unincorporated Association, hereinafter "Grantee", any and all right, title, interest and claim which Grantors may have in the real property located in Santa Clara County, California commonly known as 2155 Dahlberg Court, Morgan Hill, California, 95037, and more particularly described in the Official Records of the Recorder of Santa Clara County, Santa Clara County, California as:

Parcel 3, as shown on that certain Map entitled, "PARCEL MAP", which Map was filed for record in the office of the Recorder of the County of Santa Clara, State of California, in Book 291 of Maps at Page(s) 2.

Date: May 29, 2010

_____
Jeff Veliquette, Grantor

_____
Sally Veliquette, Grantor

State of California            )
                              ) ss
County of Santa Clara          )

On June 26, 2010 _____ before me, Gagan Sahi _____, Notary Public, personally appeared Jeff Veliquette and Sally Veliquette who proved to me on the basis of satisfactory evidence to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument the persons, or the entity upon behalf of which the persons acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Witness my hand and official seal.

Signature _____
                Notary            (Seal)



GAGAN SAHI
COMM. #1863672
Notary Public-California
SANTA CLARA COUNTY
My Comm. Exp. SEPT 3, 2013

# EXHIBIT 4

# Declaration of Mark A.Manning

HOPE RENEWED
Mark A. Manning
1152 98th Ave
Oakland, CA. 94603

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

HOPE RENEWED )
)  Case No.:
Mark A. Manning, Pro se )
)  DECLARATION OF MARK A. MANNING
)
Plaintiff, )
)
vs. )
)
BAC HOME LOANS SERVICING, LP )
)
and JOHN DOES )
)
(Investors) 1-10,000 )
)
Defendant )
)
)
)
)

I, Mark A. Manning, sui juris, declare as follows:

1. I am Agent for HOPE RENEWED, a legal fiction entity. In my capacity as agent, I have

personal knowledge of the facts stated herein and if called to testify thereon, I could and would

competently do so.

2. I am listed as a Plaintiff in this action for the property located at 2155 Dahlberg Court, Morgan

Hill, CA, 95037 ("Property"), which is the subject of this action, which HOPE RENEWED acquired on

or about May 29, 2010.

[Declaration of Mark A. Manning] - 1

3. I make periodic inspections of the property on behalf of HOPE RENEWED to determine its status.

4. Up to and including the date of this declaration, BAC HOME LOANS SERVICING, LP and their agents claim and continue to claim possession of the property. Plaintiff does not have peaceful possession of the property.

I expressly reserve the right to amend or supplement this request as needed.  I also reserve my right to have this request construed so as to do justice according to FRCP 8 (e) and all other applicable law.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration is executed on March 18th, 2011, at Oakland, California.


By: *Mark – A. ; Manning* agent

Mark – A. ; Manning

# EXHIBIT 6
# DTT Affidavit Form



## County of San Mateo
## TRANSFER TAX AFFIDAVIT

# DTT AFFIDAVIT

Per San Mateo County Ordinance Code 2.93.050

NOTICE: Any material misrepresentation of fact in this affidavit is a misdemeanor under section 2.93.120 of the San Mateo County real property tax code. Any person who makes such a representation is subject to prosecution for such offense.

The Assessor-Clerk-Recorder reserves the right to report potentially fraudulent recordings to the District Attorney's Real Estate Fraud Unit.

This form must accompany any document that requires a Documentary Transfer Tax declaration, including but not limited to, Agreement for Sale; Assignment of Lease; Deed in Lieu of Foreclosure; Easement; Grant Deed; Land Contract; Lease; Memorandum of Lease.

---

1. LOCATION OF PROPERTY. Assessor's Parcel Number: _____   City: _____

   Street Address: _____   Document To Be Recorded: _____

2. IS THIS A FORECLOSURE OR TRUSTEE SALE?   ☐ Yes   ☐ No (If yes, complete this section.)

   a. Is the transferee the Beneficiary or Mortgagee?   ☐ Yes   ☐ No

   b. Please provide.   Name of Trustee: _____

   Date of original Deed of Trust: _____

3. IS THIS A LEASE?   ☐ Yes   ☐ No (If yes or no, complete this section.)

   a. Is remaining term of lease, including renewal options, greater than 35 years?   ☐ Yes   ☐ No

   b. If NO, submit a copy of the lease, or summary, or terms.

   c. If YES, enter the value of the lease interest on line 9a. (For tax calculations.)

4. IS THIS A GIFT IN WHOLE OR IN PART?   ☐ Yes   ☐ No (If yes, give a complete explanation.)

   Name of the Donor: _____

   Name of the Donee: _____

---

> Please be aware that certain gifts in excess of $13,000 per calendar year may trigger a Federal Gift Tax. In such cases, the Transferor/Donor may be required to fill out a Form 709 (Federal Gift Tax Return) with the Internal Revenue Service. Please also be aware that the information stated on this document may be given to and used by governmental agencies, including the Internal Revenue Service.

*I, as the Transferor/Donor declare under penalty of perjury that I have read the above paragraph and acknowledge that a Federal Gift Tax may be triggered.*

▶ _____   _____   ( )  _____
  Signature of Donor:                      Print Donor Name:              Donor Phone:
  SIGNATURE ON REVERSE STILL REQUIRED

5. ARE YOU ADDING OR REMOVING A CO-OWNER FOR REFINANCING PURPOSES?   ☐ Yes   ☐ No   Initial here:
   If yes, initial to the right to indicate your agreement with the statement below and sign on reverse   ▶ _____

   *The proportional ownership interest will revert back to its original holding within one (1) month from the date of recording; otherwise I will pay the applicable transfer tax.*

---

Continued on Reverse

THIS DOCUMENT IS NOT SUBJECT TO PUBLIC INSPECTION.

Page 1 of 2

TRANSFER TAX AFFIDAVIT, pg. 2

6. ARE YOU MOVING TITLE INTO OR OUT OF A TRUST?   ☐ Yes   ☐ No   /   ☐ Into   ☐ Out of   /   ☐ Revocable   ☐ Irrevocable

   a. Name of Trust:                                            b. Date of Trust

   c. Name of Trustor(s):

   d. Name(s) of Currently Active Trustee(s):

   e. If this transaction changes who is on title or the proportional interest of how title is held, further explanation is required and may require additional time to review

   Attach additional page(s) if necessary

7. DO YOU CONTEND THAT NO TRANSFER TAX IS DUE FOR A REASON NOT EXPLAINED IN #1-6?   ☐ Yes   ☐ No

   a. The nature of the transaction is                                 (If yes, give a complete explanation.)

   b. The reason (exemption) you claim no tax is due

8. IS THIS A TRANSFER BETWEEN LEGAL ENTITIES?   ☐ Yes   ☐ No

   IF YES, TRANSFERS INVOLVING LEGAL ENTITIES MUST PROVIDE, PREFERRABLY ONE (1) WEEK IN ADVANCE, APPLICABLE DOCU-MENTATION. SOME EXAMPLES ARE LISTED BELOW. THIS TYPE OF TRANSACTION WILL REQUIRE 1-3 BUSINESS DAYS TO REVIEW.

   Entity ownership documentation is required if you are a:

     Corporation—A copy of the Articles of Incorporation amendments and any other documents showing the shares issued and share ownership; or

     LLC —A copy of the Operating Agreement, amendments, and any other documentation showing the partners and ownership \percentage, or

     Partnership— A copy of the Partner Agreement, amendments and any other documents showing the part-ners and ownership percentage.

For all legal entities, provide the names of individuals and specfic percentages held by each individual prior to and following the transfer

9. TAXABLE TRANSACTIONS. Complete the following and calculate the tax below. Tax is calculated as $0.55 per $500 of line 9D. Example, $100,000 value/$500 increments = 200. 200 increments x $0.55 = $110 in tax due. You may also use $1.10 per $1000 of line 9D. Always round up.

                            A) Consideration paid or value  $

                            B) ☐ Full cash value. ☐ Less liens

                        C) If less liens, loan amount assumed  $

        D) Total consideration or value less liens. (Line A minus line C )  $

                                E) Tax due  $

       I DECLARE OR AFFIRM UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

   Are you the ☐ Transferee, ☐ Transferor, ☐ Both, or ☐ Representative with full knowledge of foregoing. Signature still required.

| | |
|---|---|
| Signature of Transferee: | Print Name: |
| Address of Transferee: | Phone Number of Transferee:  (   ) |
| Signature of Transferor: | Print Name: |
| Address of Transferor: | Phone Number of Transferor:  (   ) |
| Place of Execution: (City, County, State where executed.) | Date of Execution |